NOT FOR PUBLICATION                                                                          CLOSED

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KEITH R. THOMAS,<br><br>                              Plaintiff,<br><br>v.<br><br>UNITED PARCEL SERVICE, INC., et al.,<br><br>                              Defendant. | Civil Action No.: 07-5607 (JLL)<br><br><br>OPINION |

**LINARES**, District Judge.

This matter comes before the Court by way of Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. The Court has considered the submissions made in support of and in opposition to the instant motion. No oral argument heard. Fed. R. Civ. P. 78. Based on the reasons that follow, Defendant's motion is **granted.**

BACKGROUND

Defendant, the United Parcel Service, Inc. (Defendant or "UPS"), hired Plaintiff, Keith Thomas, in October 1999 as a part-time package loader to work out of their Saddle Brook Center. (Def. 56.1 Stmt., ¶ 1; Pl. Responsive Stmt., ¶ 1). Plaintiff became a full-time package car driver for UPS in June 1994 and remained in that position through the date of his deposition in this matter. (Def. 56.1 Stmt., ¶ 2; Pl. Responsive Stmt., ¶ 2). The conditions of Plaintiff's employment were governed by a collective bargaining agreement ("CBA"). (Id., ¶ 10). In September 1994, Plaintiff

bid on and received a delivery route in Paterson, New Jersey. (Id., ¶ 6). The Paterson delivery route has been Plaintiff's regular delivery route since September 1994. (Id., ¶ 7; Lynch Cert., Ex. B, Thomas Dep. Tr. (Oct. 30, 2008) at 12:6-22). Only once between 1994 and October 2008 did Plaintiff attempt to bid off his delivery route in Paterson. (Def. 56.1 Stmt., ¶ 8; Pl. Responsive Stmt., ¶ 8). He received that bid because he was the driver with most seniority. (Id., ¶ 9). He opted not to change routes, however, after his supervisor, Kerry Byrd, convinced him that it would be more beneficial for him to stay on his original route. (Id., ¶ 11).

Package car drivers, like Plaintiff, receive their regular rate of pay for the first eight hours of their working day. (Id., ¶ 23). Package car drivers receive daily overtime at 1 ½ times their regular rate of pay for hours worked over eight. (Id., ¶ 24). Plaintiff generally tried to work as much overtime as permitted. (Id., ¶ 25).

Throughout his years at UPS, Plaintiff has had a positive working experience with all but two of the Saddle Brook Center managers that he has worked for: Julio Nieves and Dave Werrell. (Id., ¶ 17). Plaintiff is African American, Nieves is Hispanic and Werrell is Caucasian. (Id., ¶ 18). Nieves was the Saddle Brook Center Manager from early 1998 through February 1999. (Id., ¶ 19). From 1998 through 1999, Nieves, instructed all drivers in the Saddle Brook Center that they should not work more than 9 ½ hours per day (i.e., more than 1 ½ hours of overtime). (Def. 56.1 Stmt., ¶ 26; Pl. Responsive Stmt., ¶ 26). In early 1998, Nieves requested that Plaintiff not be "overallowed" more than 1 hour and 44 minutes per day; Plaintiff would not commit to same. (Id., ¶¶ 28, 29). "Overallowance" refers to the amount of time which is greater than that which UPS has projected it should take a package car driver to perform his or her daily deliveries. (Id., ¶ 21). Plaintiff continued at a reduced dispatch until Nieves left the Saddle Brook Center, in early 1999. (Id., ¶ 36).

During that time period, he received, on average, as much as 45 minutes per day of overtime. (Id., ¶ 36).

In March 1998, Plaintiff wrote a letter to the highest ranking person in his district alleging that Nieves' attempt to reduce his overtime constituted race discrimination. (Def. 56.1 Stmt., ¶ 31; Pl. Responsive Stmt., ¶ 31). On March 5, 1998, Nieves issued Plaintiff a warning letter for his failure to report an accident he had had while driving his package car. (Id., ¶ 33). UPS has discharged package car drivers for failing to report accidents in the past. (Id., ¶ 35).

Anthony Gerbasio replaced Nieves as the Saddle Brook Center Manager in early 1999. (Def. 56.1 Stmt., ¶ 39; Pl. Responsive Stmt., ¶ 39). Gerbasio restored Plaintiff's dispatch on the condition that he would commit to finishing his route within 10 to 10 ½ hours. (Id., ¶ 40). Plaintiff worked as many hours as were permitted during that time period. (Id., ¶¶ 41, 42; Pl. Dep. Tr. (Oct. 30, 2008) at 208:1-15). Gerbasio was replaced by Joe McDowell, who served as Plaintiff's manager until 2003. Plaintiff does not believe he was subjected to any discrimination under Gerbasio or McDowell's respective tentures as manager. (Id., ¶ 42).

In 2003, Dave Werrell became the Saddle Brook Center Manager. (Def. 56.1 Stmt., ¶ 44; Pl. Responsive Stmt., ¶ 44). Plaintiff estimates that he was averaging three to four hours of overtime per day when Werrell began working at the Saddle Brook Center. (Id., ¶ 47). Werrell met with all the drivers on his first day and explained that his "number one priority" was that they work less than 9 ½ hours per day. (Id., ¶ 48). In August 2003, Werrell took away Plaintiff's last pick-up stop of the day and reduced his delivery stops. (Id., ¶ 51). Plaintiff estimates that, even after Werrell reduced his delivery stops and pick-ups, he still collected anywhere from 1 ½ to 2 ½ hours of overtime per day. (Id., ¶ 56).

In September 2004, Plaintiff made complaints to UPS' human resources department (and to its 1-800 "helpline") regarding Werrell's alleged discrimination. (Id., ¶ 84). Plaintiff met with Human Resource Manager Regina Hartley about a month later, at which time he told her that his issues with Werrell had improved. (Id., ¶ 86; Pl. Dep. Tr. (Nov. 21, 2008) at 554:7-15. In January 2005, Plaintiff sent a letter to UPS management again complaining of discrimination by Werrell. (Def. 56.1 Stmt., ¶ 88; Pl. Responsive Stmt., ¶ 88). Hartley visited the Saddle Brook Center approximately twice a month for about six months after Plaintiff sent the January 2005 letter. (Id., ¶ 90). Plaintiff was subjected to an "on-job supervision" ("OSJ") ride with supervisor Keith Reisen in March 2005. (Id., ¶ 75). Werrell transferred out of the Saddle Brook Center in January 2006. (Id., ¶ 78). UPS did not issue Plaintiff any warning letters, nor did it suspend or discharge Plaintiff from January 2005 through the date of Plaintiff's deposition in this matter. (Id., ¶ 81).

Gerbasio replaced Werrell as manager of the Saddle Brook Center in January 2006 and continues to manage Plaintiff to date. (Id., ¶ 101). Gerbasio restored parts of Plaintiff's route. (Id., ¶ 102). No complaints of discrimination have been lodged by Plaintiff against Gerbasio. (Id.).

Plaintiff's Complaint was originally filed in the Superior Court of New Jersey, Law Division, Bergen County, in September 2007. Plaintiff's Complaint sets forth the following claims for relief: (1) race discrimination in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1, et seq., (2) hostile work environment in violation of NJLAD, (3) retaliation in violation of NJLAD, and (4) intentional infliction of emotional distress. Defendant filed a Notice of Removal with this Court in November 2007.[1]  Currently before the Court is Defendant's motion for summary judgment.

---

[1] This Court's jurisdiction is premised on 28 U.S.C. § 1332(a).

**LEGAL STANDARD**

A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party first must show that no genuine issue of material fact exists. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial. Id. at 324. The non-moving party must offer specific facts that establish a genuine issue of material fact and may not simply rely on unsupported assertions, bare allegations, or speculation. See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999). Also, the Court must consider all facts presented and the reasonable inferences drawn from them in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

**DISCUSSION**

Defendant seeks summary judgment as to each of Plaintiff's claims: (1) race discrimination in violation of NJLAD, (2) hostile work environment in violation of NJLAD, (3) retaliation in violation of NJLAD, and (4) intentional infliction of emotional distress. The Court will address each claim, in turn.

**1.      Race Discrimination**

Proof of discrimination, in violation of NJLAD, involves a three step process. "First, the plaintiff carries the burden of establishing, by a preponderance of the evidence, the elements of a prima facie case of discrimination. Greenberg v. Camden County Vocational and Technical Sch.,

310 N.J. Super. 189, 198 (App. Div. 1998) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  The elements comprising a prima facie case for discrimination under NJLAD are that: "(1) plaintiff belongs to a protected class; (2) she was performing her job at a level that met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) others not within the protected class did not suffer similar adverse employment actions." El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 167 (App. Div. 2005). After an employee has established a prima facie case, "the burden then shifts to the employer to rebut the presumption of discrimination by either establishing the reasonableness of the otherwise discriminatory act or by articulating a legitimate, nondiscriminatory reason for the employment action." Greenberg, 310 N.J. Super. at 199.  If the employer is able to articulate such a reason, the plaintiff must then show that the proffered reason was a pretext for a racially discriminatory decision. McDonnell Douglas, 411 U.S. at 804-5; see generally Monaco v. Am. Gen. Assur. Co., 359 F.3d 296, 300 (3d Cir. 2004) (applying McDonnell Douglas framework to NJLAD claim).   It is undisputed that Plaintiff is a member of a protected class.[2]

Defendant seeks summary judgment on the basis that Plaintiff cannot point to any adverse employment action which occurred during the limitations period.  In this regard, Defendant argues, first, that because the parties entered into an agreement on February 16, 2007 tolling the statute of limitations,[3] only those acts which occurred on or after February 16, 2005 are actionable.  Plaintiff does not dispute that such an agreement was made or that the limitations period began on February

---

[2] See Rogers v. Alternative Resources Corp., 440 F. Supp. 2d 366, 371 (D.N.J. 2006) ("Rogers is a member of a protected class, as he is an African American.").

[3] Lynch Cert., ¶ 2.


16, 2005. Second, Defendant maintains that Plaintiff has failed to come forward with proof of an adverse employment action inasmuch as UPS did not: issue Plaintiff any warning letters; suspend, discharge, demote or transfer Plaintiff; reduce his salary or benefits; or deny him a promotion. To the contrary, Defendant maintains that Plaintiff has "continuously remained on his route in Paterson to this day, enjoying annual salary increases, significant overtime pay, and a comprehensive benefit package." (Def. Br. at 16). Plaintiff opposes Defendant's motion on the basis that the UPS's "systematic reduction" in his overtime opportunities constitutes an adverse employment action for purposes of its NJLAD claim.

"The statute of limitations for claims arising under the [NJ]LAD is two years." Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 803 A.2d 611, 621 (N.J. 2002). But, "[w]hen an individual is subject to a continual, cumulative pattern of tortious conduct, the statute of limitations does not begin to run until the wrongful action ceases." Wilson v. Wal-Mart Stores, 158 N.J. 263, 729 A.2d 1006, 1010 (N.J.1999); see also Shepherd, 803 A.2d at 624 ("[P]laintiffs' cause of action accrued on the date of the last act in the pattern or series of acts that comprise the continuing violation claim."). As previously stated, Plaintiff does not dispute that the statute of limitations on his NJLAD claims is two-years or that the limitations period began on February 16, 2005.

As a preliminary matter, Plaintiff fails to specify the particular acts which form the basis of his discrimination claim and fails to address the timing of such acts for statute of limitations purposes. Based on evidence contained in the record, the Court gleans two general reductions in Plaintiff's overtime opportunities: the first occurring while under the management of Nieves (in early 1998), and the second occurring while under the management of Werrell (in 2003). The Court also notes that Plaintiff testified that his route was reduced (i.e., he was afforded less overtime

opportunities) in August 2003, February 2004 and August 2004. Pl. Dep. Tr. (Oct. 30, 2008) at 332:9-24. Such reductions <u>all</u> fall outside the statute of limitations period (which began in February 2005)[4] and are therefore untimely. Plaintiff has provided the Court with no legal argument or basis on which to find otherwise.

Even assuming, <u>arguendo</u>, that such reductions fell within the statute of limitations period, Plaintiff cites to no legal authority in support of the position that a reduction in overtime opportunities, in factually similar circumstances, constitutes an adverse employment action. Although loss of overtime pay could, in certain circumstances, constitute an adverse employment action,[5] evidence contained in the record refutes any such claim in this case. For instance, evidence contained in the record confirms that Plaintiff averaged more than 12.6 hours of overtime per week and earned more than $54,000 in overtime between February 2005 (the beginning of the limitations period) and March 2007. <u>See</u> Lynch Cert., Ex. J. Evidence contained in the record also confirms that Plaintiff collected overtime pay <u>each</u> week that he worked between February 2005 and March 2007. <u>See id.</u> Out of all 60 drivers from the Saddle Brook Center who earned overtime pay between December 5 and 30 in 2005, it is undisputed that Plaintiff received the <u>most</u>. <u>See</u> Lynch Cert., Ex L; Def. 56.1 Stmt., ¶ 80; Pl. Responsive Stmt., ¶ 80. In light of the foregoing, Plaintiff has not demonstrated that he suffered an adverse employment action with respect to a denial of overtime.[6]

---

[4] Plaintiff does not dispute this.

[5] <u>See, e.g.</u>, <u>Albright v. City of Philadelphia</u>, 399 F. Supp. 2d 575, 587 (E.D. Pa. 2005) ("Lack of overtime opportunities . . . is a form of reduction in compensation.").

[6] Even assuming, <u>arguendo</u>, that such a reduction in overtime opportunities were deemed an adverse employment action, Plaintiff points to no evidence from which a fact-finder could infer discriminatory intent. To the contrary, Defendant has sufficiently met its burden in demonstrating a nondiscriminatory reason for reducing his overtime opportunities, namely an across the board

See, e.g., Boykins v. Lucent Techs., Inc., 78 F. Supp. 2d 402, 416 (E.D. Pa. 2000) (finding no adverse employment action based on reduction in overtime where company overtime records confirmed that " plaintiff had the most overtime hours of any employee in his shift and subclassification in 1996, 1997, and 1998."); Babcock v. New York State Office of Mental Health, No. 04-2261, 2009 WL 1598796, at *5 (S.D.N.Y. June 8, 2009) (finding no adverse employment action where "the undisputed record reveals that Babcock received an extraordinarily high amount of overtime compensation during the relevant time periods."). Defendant's motion for summary judgment as to this claim is therefore granted.

**2.      Hostile Work Environment**

A hostile work environment claim under the NJLAD requires a plaintiff to prove (1) that the conduct would not have occurred but for the employee's protected class and  that the conduct was "(2) severe or pervasive enough to make a (3) a reasonable [member of the protected class] believe that (4) the conditions of employment were altered and that the working environment is hostile or abusive." Lehmann v. Toys R Us, Inc., 132 N.J. 587, 626 A.2d 445, 454 (N.J.1993) (emphasis in original removed). In determining whether similar conduct is severe or pervasive, New Jersey courts have looked to the following factors:

---

limitation on the number of hours that its drivers work per day. See Greenberg, 310 N.J. Super. at 199.  For instance, evidence contained in the record confirms that Nieves, instructed all drivers in the Saddle Brook Center that they should not work more than 9 ½ hours per day. (Def. 56.1 Stmt., ¶ 26; Pl. Responsive Stmt., ¶ 26).  Similarly, Werrell testified that on his first day on the job, he met with the entire workforce and conveyed that his number one priority was to limit their hours to 9 ½ hours or less per day. (Lynch Cert., Ex. C, Werrell Dep. Tr. (Dec. 3, 2008) at 167:23-168:17).  Even after Werrell reduced Plaintiff's stops, Plaintiff testified that he still collected anywhere from 1 3/4 to 2 ½ hours of overtime per day. (Lynch Cert., Ex. B, Thomas Dep. Tr. (Oct. 30, 2008) at 273:23-274:1).  Plaintiff offers no evidence that the rationale underlying the actions taken by Nieves and Werrell was pretextual.

> (1) the total physical environment of the plaintiffs' work area; (2) the degree and type of obscenity that filled the environment of the workplace, both before and after the plaintiffs were assigned to the specific workplace; (3) the nature of the unwelcome sexual words or sexual gestures; (4) the frequency of the offensive encounters; (5) the severity of the offensive encounters; (6) whether the unwelcome comments or gestures were physically threatening; (7) whether the offensive encounters unreasonably interfered with any plaintiff's work performance, but subject to the admonition that each plaintiff is not obliged to prove that the unwelcome comments or gestures actually did interfere with each plaintiff's work performance; and (8) whether the offensive encounters had an effect on any plaintiff's psychological well-being, but also subject to an admonition that each plaintiff need not demonstrate specific psychological harm, for, as we have noted, the nature of the harm to any plaintiff is the creation of a hostile work environment.

Baliko v. Int'l Union of Operating Eng'rs, Local 825, 322 N.J. Super. 261, 730 A.2d 895, 903-04 (App. Div. 1999). In addressing hostile work environment claims under the NJLAD, the focus is on the harassing conduct and the effect of such conduct must be examined as a whole, not individually, but a single event can suffice to show a hostile work environment. Lehmann, 626 A.2d at 454, 455. In making this assessment, the Court must utilize a reasonable-person standard. See Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008).

As a preliminary matter, the Court notes, again, that Plaintiff fails to specify which discrete acts by UPS management form the basis of this particular claim. Neither the Court nor Defendant should be required to sift through a tome of allegations to piece together Plaintiff's claims. See Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys., 309 F.3d 433, 436 (7th Cir. 2002).  In any event, Plaintiff's hostile work environment claim appears to be based upon several actions taken by UPS management: (1) attempts by Nieves and Werrell to reduce Plaintiff's overtime hours, (2) two incidents involving on-job supervision ("OJS") rides, (3) an incident concerning his Department of

Transportation ("DOT") card, and (4) "constant badgering" by UPS management "on the basis of his race."

It is undisputed that: (1) there is a two-year statute of limitations for claims brought under NJLAD,[7] (2) the parties entered into an agreement tolling the statute of limitations on February 16, 2007,[8] and (3) the statute of limitations period on Plaintiff's NJLAD claims began to run on February 15, 2005. Therefore, the Court finds that any conduct taking place prior to February 16, 2005 may not serve as a basis for Plaintiff's hostile work environment claim. Although an exception to the two-year statute of limitation exists if there is a continuing violation of the statute, see Wilson, 158 N.J. at 272, Plaintiff fails to reference this exception, much less demonstrate that it should be applied.[9]

The Court has already found allegations concerning a reduction in Plaintiff's overtime opportunities to be time-barred. Turning now to allegations concerning Plaintiff being subjected to OJS rides, Plaintiff testified to being subjected to OJS rides by supervisor Donovan. (Pl. Supplemental Stmt., ¶ 12). Such rides occurred while Plaintiff was under the management of Nieves

---

[7] See Montells v. Haynes, 133 N.J. 282, 286, 292 (1993).

[8] See Lynch Cert., ¶ 2.

[9] In any event, the Court finds that the four year gap between Defendant's alleged discriminatory acts precludes application of the continuing violation theory, at least with respect to conduct taking place prior to 2003. See Def. 56.1 Stmt., ¶ 42 ("Plaintiff does not believe that he was subjected to any discrimination under Gerbasio and his successor, Joe McDowell, while he worked for them between early 1999 and August 2003."); Pl. Responsive Stmt., ¶ 42 ("Admitted."). See, e.g., Hamera v. Cty. of Berks, 248 Fed. Appx. 422, 424 (3d Cir. 2007) ("[G]iven the four-year gap between the allegedly discriminatory comments, we agree with the District Court that 'Hamera has failed to pose a genuine issue of material fact under a continuing violation theory that the allegedly discriminatory comments that occurred during 2000 or before, and related to Hamera's religion, are actionable.' ").

(from early 1998 through February 1999) and are therefore untimely. See Lynch Cert., Ex. B, Pl. Tr. (Oct. 30, 2008) at 47:4-48:21; 175:4-178:1. Plaintiff was also subjected to an OJS ride with supervisor Keith Reisen in March 2005. (Def. 56.1 Stmt., ¶75; Pl. Responsive Stmt., ¶75). It is undisputed that Section 2 of Article 37 of the operative CBA authorizes "on-job supervision." (Def. 56.1 Stmt., ¶ 73; Pl. Responsive Stmt., ¶ 73).

Plaintiff also testified as to two issues concerning his Department of Transportation Card. First, Plaintiff testified that he received notification in or around May 2006 that he had to take a physical exam to be in compliance with DOT regulations. (Pl. Dep. Tr. (Oct. 30, 2008) at 565:2-568:22). Plaintiff questioned the need for the physical because he had taken one the year before. (Id.). Plaintiff testified that the reason given to him for the need for the physical was because the expiration date listed on his DOT card had been altered by way of a handwritten notation. (Id.). It is undisputed that a service provider must have a valid DOT card in order to drive a package car. (Def. 56.1 Stmt., ¶ 105; Pl. Responsive Stmt., ¶ 105). Plaintiff testified that once he took his physical, he was issued a new card. (Pl. Dep. Tr. (Oct. 30, 2008) at 567:11-15).

Lastly, Plaintiff bases his hostile work environment claim on allegations that he was subjected to "constant badgering on the basis of his race." In his supplemental statement of facts, Plaintiff points to one portion of his deposition transcript in support of this contention. (Pl. Supplemental Stmt., ¶ 33). Therein, Plaintiff testified to the following:

> To be badgered before you go out on the road is very, very disturbing because you're thinking about the things that were brought up at the meeting instead of concentrating on the work at hand. You want to be able to come into work, have clarity of mind, be able to concentrate on your job and go about your workday in a professional fashion. If you are mentally beat up before you go out on the road to do your job, then it plays on your mental ability to be able to think clearly and do

> your job.

(Pl. Dep. Tr. (Oct. 30, 2008) at 609:1-10). Plaintiff fails to specify the nature of any specific comments, when they were made and/or by whom.

Having considered the foregoing claims, Plaintiff's hostile work environment claim fails because the conduct at issue (namely, the March 2005 OJS ride, the May 2006 incident concerning his DOT card and the generalized workplace "badgering") was not severe or pervasive enough (either singly or as a whole) to support a hostile work environment claim under New Jersey law. Consideration of the Baliko factors confirms this. See Baliko, 322 N.J. Super. at 275. For instance, there is no indication that the work environment in general was racially hostile, that racial obscenities were employed at work, that racial slurs were made around Plaintiff or that Plaintiff was physically threatened. Id. There is simply no evidence before the Court suggesting that the conduct at issue would not have occurred but for Plaintiff's race. See, e.g., Lehmann, 132 N.J. at 604 ("Plaintiff need show only that the harassment would not have occurred but for her sex."). Nor does the evidence suggest that a reasonable person would find such an environment to be hostile. This Court, therefore, finds that Plaintiff has not set forth a claim of hostile work environment based on race under the NJLAD. Defendant's motion for summary judgment as to this claim is, therefore, granted.

**3.      Retaliation**

NJLAD makes it unlawful "[f]or any person to take reprisals against [another] person because that person has opposed any practices or acts forbidden under [the NJLAD] ...." N.J. Stat. Ann. § 10:5-12(d). Thus, in order to set forth a prima facie case of unlawful retaliation under the NJLAD, a plaintiff "must show: (1) that he engaged in a protected activity; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between the protected activity

and the adverse employment action." Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001). Having found that Plaintiff failed to demonstrate that he suffered an adverse employment action in the context of his race discrimination claim, see supra Part 1, Plaintiff's claim of retaliation under NJLAD must also fail for the same reasons. Plaintiff has given the Court no reasonable basis on which to find otherwise. Defendant's motion for summary judgment as to this claim is granted.

**4.      Intentional Infliction of Emotional Distress**

To establish a claim for intentional infliction of emotional distress ("IIED"), the plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe. See Buckley v. Trenton Saving Fund Soc., 111 N.J. 355, 544 A.2d 857, 863 (1988). At the summary judgment stage, if Plaintiff fails to make a sufficient showing regarding an essential element of her case upon which he or she will bear the burden of proof at trial, all other facts are necessarily immaterial and summary judgment must be granted. Celotex, 477 U.S. at 321.

Defendant moves for summary judgment on the basis that: (1) this claim is duplicative of Plaintiff's NJLAD claims, and (2) the allegations made by Plaintiff in support of this claim are entirely unsubstantiated and, in any event, fail to rise to the level of outrageousness necessary to state a claim for IIED under New Jersey law.

Plaintiff presents no evidence that he experienced severe emotional distress. See, e.g., Buckley, 111 N.J. at 369 (finding complaints of "aggravation, embarrassment, an unspecified number of headaches, and loss of sleep" "insufficient as a matter of law to support a finding that the mental distress was so severe that no reasonable man could be expected to endure it."). The Appellate Division has described severe emotional distress as:

> [A] severe and disabling emotional or mental condition which may be

> generally recognized and diagnosed by trained professionals. The emotional distress must be sufficiently substantial to result in either physical illness or serious psychological sequelae. The standard is an objective one.

Turner v. Wong, 363 N.J. Super. 186, 200 (App. Div. 2003). Plaintiff testified to the following:

> Q: You claim that you have suffered severe emotional distress. Can you describe that severe emotional distress to me?
>
> A: It's having to go to work every day under the pressure of whether you're going to be called in the office, whether you're going to have a full day's worth of work, whether you're going to be signaled out and called in the office for something that could be discussed on the outside of the office. It's just not knowing from day to day what's going to be thrown at you. Emotionally, it plays on you to the point where you cannot have a normal day, and there were no normal days with Mr. Werrell or Mr. Nieves. They were all filled with hurt, disdain for going to a job, putting on a brown uniform, should be treated like everybody else and not being treated the same.
>
> . . . .
>
> There were days that I went home and lied down on the bed and actually cried because, here I am, a man who has reached 40 years old, and I'm being treated like some of the stories that you have heard about discrimination in the 60's.

Pl. Dep. Tr. (Oct. 30, 2008) at 614:16-620:20. Such generalized claims do not amount to severe emotional distress under New Jersey law. See, e.g., Turner, 363 N.J. Super. at 202 ("We cannot infer severe emotional distress simply from proof of racial slurs alone without further evidence of resultant physical illness or serious psychological sequella, none of which has been proffered by plaintiff."); Lascurain v. City of Newark, 349 N.J. Super. 251, 280 (App. Div. 2002) (finding no severe emotional distress where plaintiff became nauseous, upset, depressed, had nightmares, and no longer enjoyed her daily activities, even where her physician corroborated her symptoms of depression);

Griffin v. Tops Appliance City, Inc., 337 N.J. Super. 15, 26 (2001) (finding no IIED where plaintiff felt terribly, was devastated, and claimed that his whole personality changed as a result of the incident in question); Aly v. Garcia, 333 N.J. Super. 195, 204 (App. Div. 2000) ("It is not enough to establish that a party is acutely upset by reason of the incident. In order to be actionable, the claimed emotional distress must be sufficiently substantial to result in physical illness or serious psychological sequelae."). Because Plaintiff has not demonstrated that he experienced severe emotional distress, the Court's analysis need go no further. See, e.g., Buckley, 111 N.J. at 369 ("Our finding of the absence of severe emotional distress renders unnecessary the determination whether the bank's conduct was extreme or outrageous or whether Mrs. Buckley's intervening conduct in complaining to Buckley broke the chain of causation between the dishonor and Buckley's claimed emotional distress."). Defendant's motion for summary judgment as to this claim is granted.

## CONCLUSION

Based on the reasons set forth above, Defendant's motion for summary judgment is granted in its entirety. Plaintiff's NJLAD claims (racial discrimination, hostile work environment and retaliation) are dismissed with prejudice, as is Plaintiff's intentional infliction of emotional distress claim. The Clerk's Office is hereby directed to close the Court's file in this matter.

An appropriate Order accompanies this Opinion.


DATE: September 9, 2010
/s/ Jose L. Linares
JOSE L. LINARES,
UNITED STATES DISTRICT JUDGE